1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

EASTERN DISTRICT OF CALIFORNIA

10

11  MAX SHELDON MARGULIS,                    Case No.  1:13-cv-02021-SKO

12                                           **ORDER ON PLAINTIFF'S COMPLAINT**

                        Plaintiff,
13                                           (Doc. No. 21)

14        v.

15

16  CAROLYN W. COLVIN,
    Acting Commissioner of Social Security,

17                        Defendant.

18

19  _____

20

21                          **I.   INTRODUCTION**

22        Plaintiff, Max Sheldon Margulis ("Plaintiff"), seeks judicial review of a final decision of

23  the Commissioner of Social Security (the "Commissioner") denying his application for Disability

24  Insurance Benefits ("DIB") benefits pursuant to Title II and XVI of the Social Security Act.

25  42 U.S.C. § 405(g), 1383 (c).  The matter is currently before the Court on the parties' briefs,

26  which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States

27  Magistrate Judge.[1]

28  _____

    [1]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 6, 8.)

## II.   FACTUAL BACKGROUND

Plaintiff was born on March 19, 1992, and alleges disability beginning on March 19, 2010. (AR 9-24; 276-87.)   Plaintiff claims he is disabled due to bipolar disorder, anxiety disorder, depression, attention deficit disorder, intermittent explosive disorder, dyslexia, speech and language disorder, learning disorders, digestive disorder, neurological disorder, and "[m]ental disorders and physical conditions." (AR 279.)

**A.**   **Relevant Medical Evidence**

**a.**   **Hospital Records**

On December 11, 2004, Plaintiff was seen at the Children Crisis Center ("CCAIR") after he threatened to jump off a ledge in his house because he "was upset with his father because the father did not buy him a Yu Gi Yo card that he wanted." (AR 464-65.)   Notes indicate that Plaintiff's paternal uncle and nephew are diagnosed with bipolar disorder. (AR 466.)   Clinician Sam Adams noted that Plaintiff "continues to make threats when he [is] angry" and opined that it "appears to be a form of manipulation" and "a way of influencing his father's behavior." (AR 469.)

On January 28, 2009, Plaintiff was seen by Dr. Syed A. Hamid, M.D., FAAP, for a follow-up consultation for his gastroesophageal reflux. (AR 330-31.)   An upper endoscopy was completed on December 30, 2008, and biopsies all came back negative, but Dr. Hamid prescribed daily Prilosec and dietary restrictions to help with his ongoing nausea and regurgitation. (AR 331.)

On May 31, 2009, Chameka Howell, CMHS, at Fresno County Children and Family Services noted that Plaintiff had been placed on a 5150 hold for suicidal thoughts, which Plaintiff believed had been caused by one of his medications. (AR 461.)   Sharon Glover, MHN II, noted that Plaintiff "presented with a sad affect and poor eye contact" and reported that he was sad six out of seven days a week and had been thinking about suicide for two years. (AR 463.)   On June 1, 2009, Myral Pacheco, MS, UMHC, noted Plaintiff "presented as depressed with flat affect. He reported feeling suicidal for two years but with no plan and no intent. [Plaintiff] stated he had not told his psychiatrist he was having [suicidal ideations] because he thought he wouldn't be

taken serious." (AR 460.)  He reported that his suicidal thoughts were brought on because he was failing math class. (AR 460.)

Plaintiff was seen on August 30, 2009, at Community Regional Medical Center after jumping off a 17 foot staircase with the "intention to injure himself." (AR 332; 339; 455; 458-59; *see also* AR 448 (police report).) He "climbed up on the stair railing" and jumped off, landing on the floor and hitting his ankles, back, and head. (AR 285.) He lost consciousness for about five minutes, awoke at the scene of the jump, and though he complained of neck and back pain, he sustained no fractures. (AR 332; 334-38; 340-44.) He was put on a 5150 hold as a result of his attempt at "self-injury." (AR 333.) In a progress note from Fresno Community Regional Medical Center, Plaintiff

> . . . appeared anxious and there was a noticeable [tremor] that appears to be a side effect of the medications [Plaintiff] is taking. [Plaintiff]'s speech was sometimes unintelligible and he appeared to be confused and [made] minimal eye contact. [Plaintiff] stated he got upset with his father because his father was upset with him. [Plaintiff] stated he barricaded himself in his bedroom and his father broke into his bedroom and grabbed him. [Plaintiff] stated his memory is foggy and he is not sure at what point he jumped off the top of the stair landing. [Plaintiff] stated he has had suicidal ideations in the past and there is documentation of [Plaintiff] presenting at the CCAIR Unit exhibiting similar suicidal ideations. [Plaintiff] denies any suicidal ideations at this time but appears to continue to be anxious and unstable at this time.

(AR 455.)  He was diagnosed with an "adjustment disorder" (AR 361) and discharged home. (AR 363).

Plaintiff was admitted to Vista Del Mar Hospital from August 31 to September 2, 2009, on a 5585 hold as a "danger to self." (AR 347; 350-51; 353; 354-55.) Dr. Robert Carvalho, M.D., noted that during "family therapy, [Plaintiff]'s father minimized [Plaintiff]'s and father's anger and impulse control issues. At the end of the 5585, parents [signed Plaintiff] out of the hospital against medical advice." (AR 347.) Dr. Carvalho noted on discharge that Plaintiff "had tremor of hands, left greater than the right. [Plaintiff] was anxious and depressed with constricted affect. Fair insight. Fair judgment." (AR 348.)

Plaintiff was seen on April 4, 2010, at Clovis Community Medical Center, for self-injury by "abraded wrist," complaining of "situational problems" with his parents, anxiety, and

depression.   (AR 356-58.)   Imaging of the lumbar spine on October 25, 2010, was normal.  (AR 369.)

Plaintiff was seen at Community Medical Centers by Lana Williams, M.D., on October 14, 2011, after "putting a knife to his throat and threatening to cut himself" "because he was depressed."  (AR 484.)   Diagnoses included bipolar disorder, Asperger's Syndrome, intermittent explosive disorder, and psychosocial mental illness.  (AR 484.)

**b.     Dr. Fox's Records**

Plaintiff was seen by David A. Fox, M.D., sporadically twenty-three times from March 4, 2005, through October 24, 2011, for consultations regarding his diagnoses of bipolar disorder, Asperger's Syndrome, Attention-Deficit Disorder, and Intermittent Explosive Disorder.  (AR 370-88; 422-24; 488-91.)

On August 17, 2011, Dr. Fox, completed a mental residual functional capacity ("RFC") form, opining that Plaintiff was "limited but satisfactory" in his ability to make simple work-related decisions, get along with co-workers or peers, and respond appropriately to changes in a routine work setting; "seriously limited, but not precluded" in his ability to remember work-like procedures, carry out very short and simple instructions, accept instructions and respond appropriately to criticism from supervisors, and maintain socially appropriate behavior; "unable to meet competitive standards" in his ability to understand and remember very short and simple instructions, maintain attention for a two-hour segment, maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the public, and ask simple questions or request assistance; and, had "no useful ability to function" in completing a normal workday and workweek without interruptions from his psychologically based problems, use public transportation or travel in an unfamiliar place, or deal with normal work stress.  (AR 477-79.)

Dr. Fox opined that Plaintiff "has been unable to sustain himself in school, or work or social environments for [the] past 2 years.  Anxiety makes him non-functional."  (AR 478.)

Further, Plaintiff "rapidly deteriorates under any type of work demand, performance expectation, or pressure to complete tasks." (AR 488.) Dr. Fox also scored Plaintiff at a "current" GAF[2] score of 40, with his "highest" GAF of the past year at a 45 (AR 477), and opined that Plaintiff would be absent more than 4 days a month as a result of his impairments. (AR 479.)

Dr. Fox also completed a Physical Capacities Evaluation, opining that Plaintiff had no physical limitations but would be limited to sitting, standing, or walking only 4 hours within an 8-hour workday and was totally restricted from activities involving hazards. (AR 481-82.)

### c.    Dr. House's Records

Plaintiff was seen by Matt House, D.O., beginning on December 15, 2011, and again on January 10, March 7, and April 25, 2012, for general care. (AR 506-10.) Plaintiff reported experiencing increased anxiety recently on May 22, 2012, (AR 574), and on June 19, 2012, Dr. House noted Plaintiff was "hypersomnolent," not depressed or experiencing significant anxiety, but was "very tired" and had been sleeping 15-18 hours a day. (AR 573.)

On April 24, 2012, Dr. House completed a mental RFC form, opining that Plaintiff was "seriously limited, but not precluded" in his ability to understand, remember, and carry out very short and simple instructions and ask simple questions or request assistance; was "unable to meet competitive standards" in his ability to understand and remember detailed instructions or work-like procedures, maintain attention for a two-hour segment, maintain regular attendance and be punctual within customary tolerances, make simple work-related decisions, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers, maintain socially appropriate behavior, or interact appropriately with the public; and had "no useful ability to function" in his ability to sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from his psychologically based problems, carry out detailed instructions, set realistic goals or make plans independently of others, deal with stress of

---

[2]   Global Assessment of Functioning (GAF) scale score is a numeric scale (1 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults. DSM-IV-TR at 34.

1  semiskilled and skilled work, use public transportation or travel in an unfamiliar place.  (AR 501-
2  04.)

3       Dr. House opined that Plaintiff's "mental health condition precludes [him from]
4  functioning in [the] areas indicated."  (AR 502.)  Dr. House assessed Plaintiff as having a
5  "current" GAF score of 50, assessed Plaintiff's "highest" GAF score of the past year also at 50
6  (AR 501), and  opined that Plaintiff would be absent more than 4 days a month as a result of his
7  impairments.  (AR 504.)

8       **d.   Dr. Hill's Records**

9       On August 12, 2011, Dr. Mary Hill completed a mental RFC questionnaire, opining that
10  Plaintiff was "limited but satisfactory" in his ability to remember work-like procedures,
11  understand, remember, and carry out very short and simple instructions, ask simple questions or
12  request assistance, and be aware of normal hazards and take appropriate precaution; "seriously
13  limited, but not precluded" in his ability to work in coordination or proximity to others, make
14  simple work-related decisions, and interact with the public; some mix of "seriously limited" and
15  "unable to meet competitive standards" in his ability to perform at a consistent pace without an
16  unreasonable number and length of rest periods, accept instructions and respond appropriately to
17  criticism from supervisors, get along with co-workers or peers, or respond appropriately to
18  changes in a routine work setting; and "unable to meet competitive standards" "at present" in his
19  ability to maintain attention for two-hour segments, maintain regular attendance and be punctual,
20  sustain an ordinary routine without special supervision, complete a normal workday and
21  workweek without interruptions from psychologically based symptoms, set realistic goals or make
22  plans independently of others, deal with stress of semiskilled or skilled work, or deal with normal
23  work stress.  (AR 429-31.)

24       Dr. Hill specifically opined that Plaintiff's "current mental status is highly reactive under
25  pressure" and that he is "physically capable and intellectually capable of more than his emotional
26  ability to cope[.]"  (AR 430.)  Finally, Dr. Hill opined that Plaintiff would be absent from work
27  more than four days per month due to his impairments, including his "overwhelming anxiety" and
28  "poor social skills development and utilization."  (AR 431.)

Dr. Hill also completed a physical capacities evaluation opining that Plaintiff was limited to carrying 25-50 pounds only occasionally, and all lesser weights frequently, had no postural or manipulative limitations, and was totally restricted from activities involving fumes, odors, dust, gases, or poor ventilation by his asthma.  (AR 427-28.)  She also noted that were Plaintiff "able to participate in a well[-]run structured living facility with possible modification of his medication regimen, [ ] he would improve his prospects for calm semiskilled work.  Without this he has very limited employment prospects."  (AR 428.)

In an undated letter, Dr. Hill noted that Plaintiff was characterized by his slow responses to questions and poor eye contact, difficulties developing social skills and enduring friendships, and "inability to cope with anticipated stressors" and "any sort of confronting or pressured circumstance[.]"  (AR 432.)  Dr. Hill observed that Plaintiff "experiences both physical (vomiting) and psychic distress, as well as physical outbursts which endanger him and anyone around him. He remains immature and inappropriately dependent on his parents."  (AR 432.)

**e.    Neurological Evaluation by Dr. Glidden**

On April 30, 2012, Howard J. Glidden, PhD, completed a neuropsychological evaluation of Plaintiff.  (AR 512-52.)  Dr. Glidden administered the Wechsler Adult Intelligence Scale-IV, Wechsler Memory Scale-III (Spatial Span Test), Visual Search and Attention Test, Rey-Osterreith Complex Figure Test, Hopkins Verbal Learning Test-Revised, Behavior Rating Inventory of Executive Function, Interview for Autistic Spectrum Disorder Symptomatology, Social Communication Questionnaire, Beck Depression Inventory-II, Beck Anxiety Inventory, Mental Status Examination, and a pre-test interview.  (AR 512.)

Plaintiff presented as

. . . an alert, fully oriented, well-developed, non-dysmorphic, socially reserved, predominantly right-handed, 20-year-old male who appeared to be his stated age and in no acute distress.  Vision and hearing appeared to be within functional limits and were uncorrected.  Hygiene and habits of dress were unremarkable.  He was well-kempt and neatly groomed.  [Plaintiff] consented to the evaluation, attempting all tasks presented.  There was no evidence of noncompliance or minimization of effort.  Attention and ability to focus concentration for verbal and nonverbal information were variable, but were certainly sufficient to allow completion of this lengthy evaluation without challenge.  There did appear to be some erosion of attention secondary to anxiety, which impacted performance on

1   novel learning tasks.  There was no evidence of impulsivity or hyperkinesis.  Task
2   persistence and tolerance for frustration appeared to be within normal limits.
    Affectively, his mood appeared anxious, consistent with parental report.  There
3   was no unusual posturing, nervous mannerisms, signs of agitation or stereotypies.
4   Cognitive tempo appeared to be intact.  Thought processes appeared to be within
    normal limits, with a spontaneous stream of activity.   Thought content was
5   appropriate, cogent and directed, without evidence of associational disturbance.
    Error recognition and utilization appeared to be intact.  Cognitive flexibility was
6   evident.  There was no evidence of perseverative interference or difficulty in
    shifting from one task to another.  There was no evidence of a formal thought
7   disorder.   Evaluation of speech revealed mild to moderate disarticulation
    consistent with history of phonological disorder.

8   (AR 516.)

9       Plaintiff scored in the Low Average to Average range in verbal digit span and Borderline

10  in verbal arithmetic, and Low Average in the Spatial Span Test, Visual Search and Attention Test,

11  and visuomotor test.  (AR 529-30.)  Plaintiff scored in the Average range on the Rey-Osterreith

12  copy and recognition tests, Low Average on the Rey-Osterreith immediate recall test, and

13  Impaired to Borderline on the Hopkins Verbal Learning Test-Revised.  (AR 530.)  Plaintiff scored

14  in the Average range in the Wechsler Adult Intelligence Scale-IV verbal comprehension and

15  perceptual reasoning subtests, and in the Low Average to Borderline range on the working

16  memory and processing speed subtests.  (AR 531.)  This resulted in a full scale IQ score of 92, in

17  the thirtieth percentile and within the Average range, which Dr. Glidden opined was representative

18  of "statistical averaging" and "should not be viewed as indicative of his 'overall' level of

19  intellectual ability" due to the significant variability among Plaintiff's subtest scores.  (AR 518;

20  531.)   Plaintiff was given a 75 Global Executive Composite score, within the ninety-ninth

21  percentile.  (AR 532.)  Results of the Beck Depression Inventory-II yielded a total score of 24,

22  within the Moderate range, and results of the Beck Anxiety Inventory yielded a total score of 34,

23  within the Severe range.  (AR 520.)

24      When evaluating Plaintiff's "autistic" behaviors, Dr. Glidden noted that Plaintiff

25  . . . does not appear disinterested when spoken to, does not exhibit eye-gaze
26  aversion, would rather be with others than alone, and does not have difficulty
    expressing emotions.  He does not exhibit perseverative behaviors including: hand
27  flapping/waving when excited, spinning objects or himself repetitively, smelling
    or tasting objects repetitively, liking to stroke different textures, echolalia, or
28  lining up objects.  He does not have an unusual memory for past events or places,

does not have a developed expertise, does not have a high tolerance for pain, comes to his parents for comforting when hurt, does not insist on maintenance of routines, and has well-developed joint attention.

(AR 515.)  Further, results of the "Social Communication Questionnaire, a dimensional measure of Autistic Spectrum Disorder symptomatology . . . yielded a total score of 6.  This is well below the conservative cut-off score of 15 recommended by the test's authors for a more comprehensive evaluation of an Autistic Spectrum Disorder."  (AR 520.)  Dr. Glidden opined that a diagnosis of Autistic Spectrum Disorder was not "warranted."  (AR 521.)

However, Dr. Glidden opined that based on parental report, self-report, review of the medical records, and the evaluation, Plaintiff could be credibly diagnosed as suffering from Generalized Anxiety Disorder and Social Phobia.  (AR 522-23.)  In his opinion, "[b]ecause of the severe social phobia experienced, [Plaintiff] is at a significantly reduced capacity to function in a work setting[.]"  (AR 523.)  Various coping skills, memory-aiding skills, and socialization techniques were recommended to aid Plaintiff, and academic accommodations and reading materials were proposed to help Plaintiff.  (AR 524-28.)

Dr. Glidden concluded that

Acute neuropsychological sequelae do not appear to be present in [Plaintiff's] profile.  There is no evidence of a focal, lateralized or progressive organic impairment.  There is no further evidence that [Plaintiff] has experienced a diminution of cognitive skills and abilities over time.  Rather the affective challenges noted appear to be of developmental/familial origin, rather than newly acquired, particularly when one takes into account [Plaintiff's] developmental, academic, medical and interpersonal histories.

(AR 521.)

**f.    Internal Medicine Evaluation by Dr. Damania**

On December 16, 2010, Plaintiff was examined by Rustom F. Damania, M.D., at Valley Health Resources at the request of the agency.  (AR 389-94.)  Noting that Plaintiff's bilateral hand tremors were "coarse" and more pronounced when extended, but "would stop as soon as [Plaintiff] held onto an object[,]" Dr. Damania concluded that Plaintiff's chronic hand tremors were "probably secondary to chronic anxiety."  (AR 393.)  Dr. Damania opined that Plaintiff

. . . should be able to lift and carry 50 pounds occasionally and 25 pounds frequently.  [He] can stand and walk without restriction[ ] [and] sit without

restriction.   No assistive device is necessary for ambulation.   No postural
limitations to bending, stooping or crouching.   No definite manipulative
limitations but he may have difficulty with using small tools or anything that
requires fingering because of his tremors which are secondary to anxiety.   No
relevant visual or communicative impairments.

(AR 393.)

### g.      Psychological Evaluation by Dr. Murphy

On January 26, 2011, Plaintiff was examined by James P. Murphy, M.D., at the request of

the agency, and administered the Comprehensive Trail Making Test, Bender Visual Motor Gestalt

Test-II, Wechsler Adult Intelligence Scale-IV, and Wechsler Memory Scale-IV.   (AR 399-403.)

Dr. Murphy observed that Plaintiff's

. . . attention was within normal limits and he was oriented to person, place, time,
and purpose for the interview.   His memory appeared to be intact for short term
and remote recall.   His eye contact was appropriate and his facial expression was
responsive.   His attitude towards this interviewer and the testing assignments was
cooperative and friendly.   He described his mood as "okay" and his emotional
expression was congruent to his reported mood.   His flow of speech was normal
for rate, rhythm, tone, and articulation but [he] appeared to have difficulty
pronouncing some words clearly.

[Plaintiff]'s thoughts were clear, coherent, well organized, goal directed, and
relevant to the subject at hand.   He was able to handle ideas well, and could
identify basic similarities, differences, and absurdities.

(AR 400.)

In the Comprehensive Trail Making Test, Plaintiff scored in the 13th percentile on Part A,

the 50th percentile on Part B, and the 4th percentile in Part C.   (AR 400-01.)   Though his scores

mostly fell in the Average range, Dr. Murphy noted that Plaintiff's "overall score was at the 10th

percentile which indicates that 90 percent of the population would score higher than he did."

(AR 401.)   Plaintiff scored in the High Average to Average range on the Bender Visual Motor

Gestalt Test-II, and scored as Low Average Level of Intelligence on the Wechsler Adult

Intelligence Scale-IV.   (AR 401.)   "He scored strongest in the Verbal Comprehension (VCI) level

at the 37th percentile and weakest in the Working Memory (WMI) level at the 6th percentile."

(AR 401.)   Plaintiff scored in the Mildly Impaired range on the Wechsler Memory Scale-IV.

(AR 402.)

//

Dr. Murphy opined that Plaintiff's "test scores are representative of his skills and abilities and he has consistently functioned at a lower level than he is capable of performing and it appears that this lack of performance is due partially to his emotional and physical difficulties." (AR 402.) Dr. Murphy opined Plaintiff

(A) . . . does have restrictions concerning daily activities.

(B) . . . does have difficulty maintaining social function.

(C) . . . does not appear to have problems with concentration, persistence and pace that could jeopardize his ability to work.

(D) . . . would not experience episodes of emotional deterioration in work like situations.

(1) . . . is capable of understanding, carrying out, and remembering simple instructions.

(2) . . . will not have difficulty responding appropriately to co-workers, supervisors, and the public.

(3) . . . will not have difficulty responding appropriately to usual work situations.

(4) . . . will not have difficulty dealing appropriately with changes in routine work settings.

(5) . . . does have limitations due to mental impairment.  Bipolar Disorder by history[.]

(AR 402-03.)  Dr. Murphy opined Plaintiff had a GAF of 60, and concluded Plaintiff "is capable of performing Simple Repetitive Tasks (SRT) on a regular basis."  (AR 403.)

**h.      Psychiatric Review Technique Form**

On February 10, 2011, Philip Walls, M.D., completed a Psychiatric Review Technique Form and Mental RFC.  (AR 404-21.)  Dr. Walls opined that Plaintiff suffered from organic mental disorders, affective disorder, anxiety-related disorders, mild Attention-Deficit Disorder and a possible learning disorder (AR 404-05), as well as disturbance of mood and bipolar disorder with a history of episodic manic and depressive syndromes (AR 407) and Intermittent Explosive Disorder (AR 409).  However, Dr. Walls opined that Plaintiff did not meet any Listing, nor did he meet the Paragraph "B" criteria because he only had moderate limitations in his activities of daily living and moderate difficulties in maintaining concentration, persistence, or pace, and only mild difficulties in maintaining social functioning and one or two episodes of decompensation, each of extended duration.  (AR 414.)

Dr. Walls opined that Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions, interact appropriately with the public, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in a work setting, but was not significantly limited in any other area.  (AR 418-19.)  Dr. Walls concluded that while Plaintiff's "possible learning disorder" would impair his ability to understand complex instructions and his mood changes and anxiety would limit his ability to interact with the public and accept supervision, he can understand and carry out simple tasks, complete a normal workday and workweek, and adapt to changes in simple routines.  (AR 420.)

**B.    Education Records**

**a.    Clovis Unified School District Records**

An educational evaluation dated September 30, 2005, based on observing Plaintiff during class, reflected that Plaintiff "appeared to be attentive and focused on the lecture" and that "he was engaged with the other boys in the group."  (AR 272.)  On February 5, 2008, Plaintiff received a sufficient score to pass the California High School Exit Exam (AR 239), and on May 14, 2009, Plaintiff received proficient scores in history and science, basic scores in English/language arts, and below basic scores in mathematics in the California Standards test.  (AR 240.)  In October 2008, Plaintiff's Art teacher noted that Plaintiff's performance was "borderline."  (AR 259.)  In September 2009, Plaintiff's Cross Age PE teacher reported "he is a responsible student who is good with the elementary students under him" and his American Government teacher reported he "is a good student who comes to class prepared and relates well with both the teacher and peers." (AR 240.)  The American Government teacher noted that Plaintiff was attentive in classes, but expressed concern about the volume of Plaintiff's absences and his making up missed work. (AR 240.)  The Auto shop teacher agreed that Plaintiff's absences made "progress difficult as all work is done in class" and the English teacher noted that Plaintiff was continually "missing assignments due to absences."  (AR 249.)  In September 2009, Plaintiff had "32 periods of excused absences, 4 periods of doctor's absences, and 6 excused tardies during the first six weeks of school."  (AR 240.)

//

**b.      Triennial Psychological Evaluation**

David A. Oakley, M.S., Licensed Educational Psychologist, evaluated Plaintiff on October 19, 2005, to assess his progress and educational needs.  (AR 264-71.)  Mr. Oakley noted that beginning in 2002, Plaintiff had a "Behavior Plan" developed "to address his social anxieties and avoidant behaviors" in school, and that his anxiety had "diminished markedly and he had become more independent over the course of his 7th grade year[.]"  (AR 264-65.)  As part of the evaluation, Mr. Oakley administered the Weschler Intelligence Scale for Children-III ("WISC-III"), Bender Gestalt, Behavioral Assessment Scale for Children ("BASC"), Attention Deficit Disorder Evaluation Scales ("ADDES"), and conducted a student interview.  (AR 265.)

In the WISC-III test, Plaintiff scored a 105 verbal IQ (63rd percentile), 94 performance IQ (34th percentile), 99 full scale IQ (47th percentile), 110 Verbal Index (75th percentile), 100 Perceptual Organization Index (50th percentile), and Feature Detection Index 72 (3rd percentile). (AR 265.)  Mr. Oakley opined that Plaintiff "demonstrated overall intellectual abilities that fell within the average range and at the 47th percentile, however, the sub-test variation was significant enough that "the full scale IQ should be interpreted with caution and is likely an unreliable measure and underestimate of [Plaintiff]'s true learning potentials."  (AR 266.)  Mr. Oakley also noted that Plaintiff "presented mild, but noticeable, apprehension" at the beginning of the evaluation, and opined that "[i]t is likely that his performance was affected by this anxious response style."  (AR 266.)

In the Social-Emotional BASC test, Plaintiff scored within the average range for externalizing and internalizing problems, school problems, and adaptive skills, and as "at-risk" in somatization (physical manifestation of his anxiety symptoms).  (AR 267.)  His math and science teachers noted Plaintiff's anxiety in their classes.  (AR 267.)   His science teacher noted the following: "he responds best with encouragement and positive feedback during class to maintain his effort and anxiety level[,]" he experiences "anxious reactions to work demands" and "apprehension when attempting novel activities or activities requiring extended explanation or independent organization."  (AR 267.)  Plaintiff's academic block and science teachers both noted Plaintiff "is prone to confusion (cognitive blocking and recall difficulties) and can become visibly

anxious exhibiting shakiness, stammered speech, and memory loss[,]" but reflected that Plaintiff "does well in asking for assistance."  (AR 267.)

In the ADDES test,

[t]eacher ratings of [Plaintiff]'s behaviors in the classroom indicate a child whose inattentive and hyperactive/impulsive behaviors are inconsistent and somewhat situation specific to the type of class and expected demands for organization and time management.

. . . While neither [responding teacher] noted hyper/impulsive behavior, his science teacher noted more difficulties with [Plaintiff]'s attention in her classroom rating him at the Borderline range.  Time constraint, instructional pace, and structure of the Science classroom increase distractibility for [Plaintiff] causing him to require repetition of directions and assistance with task organization.

(AR 268.)

Mr. Oakley concluded that Plaintiff "is a friendly and cooperative 8th grader with a medically diagnosed attention deficit disorder and anxious learning style . . . . managed on medications."  (AR 269.)  Plaintiff "is well behaved and well liked by classmates and faculty" and "has friends and reports no social difficulties."  (AR 269.)

### c.       Work Permit Records

On April 16, 2008, and April 1, 2009, Plaintiff applied for work permits for "casual labor" through Clovis West High School  (AR 554; 557.)  In an undated application to work with Goodwill, Plaintiff noted he could "use [a] computer" and lived with his parents.  (AR 560.)  On January 8, 2010, Plaintiff was assessed as having Category 1 "Most Significant" disability in his communication and interpersonal skills by his Department of Rehabilitation counselor Jennifer Klassen.  (AR 568-69.)

## C.       Testimony

### 1.       Adult Function Report

Plaintiff completed an Adult Function Report on November 19, 2010, stating that on a normal day he eats breakfast, plays video games with friends, and watches television, and sometimes takes a nap or goes out with his parents.  (AR 288.)  He has friends visit his house two times a week.  (AR 292.)  As a result of his condition, he stays up late and wakes up late, and has become less "active with friends."  (AR 289; 292.)  He has no problems with personal care, takes

care of his two pet fish, and cleans his room.  (AR 289-90.)  He needs reminders to take his medication and to complete his chores.  (AR 290.)  When he goes shopping, two or three times a month for "collectibles" and video games, he goes with his parents.  (AR 290.)

Plaintiff stated that he experiences problems with memory, completing tasks, concentration, following instructions, using hands, and getting along with others, and he can follow written instructions very well but has trouble with verbal instructions.  (AR 293.)  Plaintiff blames "stress" and "anxiety" as the biggest obstacles that keep him "from going to school, getting a job, driving or shopping."  (AR 295.)

### 2. Section 10 Statement and Plaintiff's Father's Letter

Plaintiff stated that his "anxiety and other mental health conditions" prevented him from completing high school, the adult education classes he needed to earn a high school diploma, the Clovis Youth Employment Program he started, the California State Department of Rehabilitation Program he started, the driver's education class he started, and the Goodwill program he tried to attend, and also prevented him from taking the bus, making phone calls, looking for work, holding a job, or taking the GED.  (AR 299.)

In a March 8, 2011, letter accompanying the Section 10 statement, Plaintiff's father stated that Plaintiff's "life is defined by anxiety and his other psychiatric conditions such as emotional instability and depression" since age four.  (AR 300.)  He stated that "[b]y the time [Plaintiff] got to junior high he began to miss considerable amounts of school due to anxiety related problems.  High School became unbearable and he attempted suicide at the beginning of his senior year.  [He] was only able to attend school sporadically during the first semester of his senior year and then had to withdraw before he could graduate."  (AR 300.)  All of Plaintiff's attempts to complete his education, obtain a driver's license, work at Goodwill, or volunteer as a teacher's aide have ended abruptly because of his anxiety.  (AR 300.)

### D. Hearing Testimony

#### 1. Plaintiff's Testimony

Plaintiff testified at his July 19, 2012 hearing that he completed his junior year of high school, and has attempted but not been able to complete a diploma or GED.  (AR 41.)  During

15

school, he largely attended "regular" classes but was pulled out for special "RSP" instruction in math and English, and also had individual tutoring two hours a week.  (AR 42-43.)  He dropped out with two months left of high school because "the stress and anxiety got to [him]." (AR 43.)

> A      Well, like, I just couldn't do anything.  And like it just stopped me from doing stuff, like normal stuff like going to classes and everything.
>
> A      . . . [And], the GED, I couldn't even get out of the truck, my dad's truck when I tried going into the building.  We had gone in when we, like first went to meet the teacher.  And then the second time to do the class work or do whatever they wanted, like the math or whatever they wanted me to do.  I couldn't get out of my dad's truck, I was just too nervous.
>
> Q      What would happen when you tried to get out  [of] your dad's truck?
>
> A      I didn't even get out.  I would – he was trying to pull me out, like trying to say it's not going to be that bad but, you know, I just always think it's going to be worse than it ever is.
>
> Q      Did they ever try to give you the work to take home to do?
>
> A      Yeah.  I had a private tutor and the same thing kind of happened.
>
> Q      What do you mean same thing kind of happened?
>
> A      I couldn't go – like we were meeting at the library and I didn't go in the library because I was too nervous.
>
> Q      What if they had had you work at home with the tutor?
>
> A      We tried that too.
>
> Q      And what happened?
>
> A      Same thing.  Like I did a little but then like the same day I just, it just got like – I don't know how to put it into words, like I just stopped and then I kind of like got into a mental break down, just like I shut down, like I couldn't do anything.

(AR 43-44.)

Plaintiff does not have a driver's license and is unable to drive because he is "afraid" he will "hit something."  (AR 41.)  He cannot take the bus because there are "[t]oo many people" riding it, so he relies on his father for transportation.  (AR 41.)  Plaintiff worked with one other person, his supervisor, doing "custodial things, like mop[ping], sweeping the ground and picking up trash" for ten hours a day, four days a week, at a school during summer vacation in 2008.  (AR 45-48.)  The job was a one-month term, but Plaintiff was forced to leave early due to his anxiety.  (AR 46-47.)  Plaintiff also worked at a storage facility for the school district, lifting boxes and sweeping floors for three hours a day, three days a week, with two supervisors and one other

student.  (AR 48-51.)  He made it through the entire month of this job, but "skipped many, many days" due to his anxiety.  (AR 50.)

Plaintiff went to "State Rehab" to test for employment, but was unable to answer or pick up a phone without anxiety and was told "well, if you can't even pick up the phone, you know, you're not going to be good in a workplace."  (AR 51.)  He also worked at a Goodwill for one day, helping people with computers.  (AR 52.)  He does not feel confident enough to work by himself on computers or watching security cameras, "[b]ecause [he's] afraid [he]'d mess up a lot."  (AR 53.)

Plaintiff testified that he feels anxious and depressed every day, and he is unable to complete tasks and "freezes up."  (AR 54.)  Plaintiff "shuts down" or "freezes up" more than once a day, and experiences mood swings and irregular sleep patterns.  (AR 55-56.)  When he "shuts down," Plaintiff will "just get stiff and hold a chair . . . and shake or something."  (AR 54.)  The episode will continue until he "decide[s] to go to [his] room and just like lay down" for two hours or so.  He has experienced suicidal thoughts "only like three times . . . when [he] was really depressed."  (AR 56-57.)  He has been hospitalized two or three times for suicidal thoughts.  (AR 57.)  Plaintiff takes medications for his impairments, but doesn't note much improvement when medicated.  (AR 57 ("I really don't see a difference like of helping me.  But my parents sometimes say they do, so I just believe them.").)

Plaintiff has not "done anything fun in a long time[,]" and spends a good deal of his time "just sleeping."  (AR 58.)  He also plays video games for two or three hours at a time, with breaks, and watches television.  (AR 59.)  He has an apartment to himself, but only stays there once or twice a week, and spends the rest of his time at his parents' house.  (AR 60.)  He showers "whenever [he] feel[s] like it[,]" but has never received complaints on his hygiene.  (AR 58.)  He has friends over "[u]sually every other weekend" to play video games for two hours on a split screen.  (AR 62.)  He generally does not help clean or cook around the house, and does not do his own laundry, because "it's just overwhelming," but can take out the trash.  (AR 59; 61; 65.)  He finds himself "stressed over like little simple things[,]" even feeling overwhelmed sometimes by

the simple act of putting dirty laundry into the washing machine or by a machine with only two dials.  (AR 63-64; 65.)

### 2. Vocational Expert's Testimony

The ALJ presented a hypothetical person "who is less than 50 years of age, with an 11th grade education, who would be limited to unskilled jobs that require no more than occasional public contact at any exertional levels" to the Vocational Expert ("VE").  (AR 66.)  Based on this hypothetical, the VE testified that such a hypothetical person could perform heavy and unskilled work, as a "commercial or institutional cleaner," a termite extermination helper, or a truck driver helper loading and unloading trucks.  (AR 66-67.)

Plaintiff's attorney asked the VE a follow-up hypothetical, using "all of the same elements in the first hypothetical," with the additional limitation that this hypothetical "individual would miss approximately two to four days per month due to psychological/physical symptoms[.]"  (AR 68.)  Based on this hypothetical, the VE testified that such a person would not be able to find any work.  (AR 68.)  Plaintiff's attorney then presented a third hypothetical to the VE, using "all the same elements in the first hypothetical," with the additional limitation that this hypothetical "individual could not interact with any coworkers or the public, and only occasionally interact with the supervisor[.]"  (AR 68.)  Based on this hypothetical, the VE testified that such a person would not be able to find any work.  (AR 68-69.)  Plaintiff's attorney asked the VE a final, fourth hypothetical, where "the individual had to be supervised constantly throughout the shift[.]"  (AR 69.)  The VE testified that such a person would not be able to find any work.  (AR 69.)

### C. Administrative Proceedings

On November 27, 2012, the ALJ issued a decision and determined Plaintiff was not disabled.  (AR 12-24.)  The ALJ found that Plaintiff had one severe impairment: an anxiety disorder.  (AR 15.)  The ALJ determined that this impairment did not meet or equal a listed impairment.  (AR 15.)  The ALJ found Plaintiff retained the residual functional capacity ("RFC") to "perform a full range of work at all exertional levels but with the following non-exertional limitations: he would be limited to unskilled work with only occasional public contact."  (AR 16.)  Given this RFC, the ALJ found Plaintiff was capable of "perform[ing] the requirements of

representative occupations such as Commercial Cleaner/Janitor (DOT #381.687-014), a Termite Exterminator Helper (DOT #383.687-010) or as a Truck Driver Helper/Loader (DOT #905.687-010).  (AR 23.)  The ALJ concluded that Plaintiff was not under disability, as defined in the Social Security Act, from March 19, 2010, the alleged onset date, through December 31, 2009, the date last insured.  (AR 24.)

**D.      Plaintiff's Complaint**

On December 11, 2013, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  (Doc. 1.)  Plaintiff argues that the ALJ failed to articulate specific and legitimate reasons for rejecting Dr. House's opinions in determining Plaintiff's RFC and finding Plaintiff was not disabled from the alleged onset date through the last date insured.  (Docs. 14, 11-16; 19, 3-4.)

**III.    SCOPE OF REVIEW**

The Commissioner's decision that a claimant is not disabled will be upheld by a district court if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied.  42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Davis v. Heckler*, 868 F.2d 323, 325 (9th Cir. 1989); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999); *Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985) (the findings of the Commissioner as to *any* fact, if supported by substantial evidence, are conclusive.) Substantial evidence is more than a mere scintilla, but less than a preponderance.  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  "While inferences from the record can constitute substantial evidence, only those 'reasonably drawn from the record' will suffice."  *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006) (citation omitted); *see also Desrosiers v. Sec'y of Health and Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (the Court must review the record as a whole,

"weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion.")   The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

The role of the Court is *not* to substitute its discretion in the place of the ALJ – "[t]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted); *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002); *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (the court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely."); *Sprague v. Bowen*, 812 F.2d 1226, 1229-30 (9th Cir. 1987) (if substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive).  The court will not reverse the Commissioner's decision if it is based on harmless error, which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (quoting *Stout v. Comm'r*, 454 F.3d 1050, 1055 (9th Cir. 2006)); *see also Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## IV.   APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or

impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.  In Step 1, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).  If not, the ALJ must determine at Step 2 whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If so, the ALJ moves to Step 3 and determines whether the claimant has a severe impairment or combination of impairments that meet or equal the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is therefore presumptively disabled.  *Id.* §§ 404.1520(d), 416.920(d).  If not, at Step 4 the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform her past work.  *Id.* §§ 404.1520(f), 416.920(f).  If not, at Step 5, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.   DISCUSSION

### A.   The ALJ's Consideration of the Medical Evidence

Plaintiff argues that the ALJ improperly discredited portions of treating physician Dr. House's opinion.  The Commissioner contends the ALJ properly considered the medical evidence and found Plaintiff not disabled.

#### 1.   Legal Standard

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

1   (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

2   physicians).  As a general rule, the opinion of a treating doctor is entitled to more weight than the

3   opinion of doctors who did not treat the claimant, *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.

4   1987), and absent contradiction by another doctor's opinion, may be rejected only for "clear and

5   convincing" reasons, *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991).  Even if directly

6   contradicted by another doctor's opinion, the ALJ must articulate "specific and legitimate reasons"

7   that are supported by substantial evidence in the record, to justify rejecting the treating doctor's

8   opinion.  *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).

9            **2.**       **The ALJ Improperly Discounted Portions of Dr. House's Opinion**

10       Plaintiff contends the ALJ improperly rejected Dr. House's opinion of Plaintiff's "extreme

11   limitations" as internally inconsistent with his opined GAF score.  (Doc. 14, 13; *see* AR 21.)

12   Plaintiff argues that the Commissioner has unambiguously stated that the GAF score "does not

13   have a direct correlation to the severity requirements in [the] mental disorders listings" and is an

14   illegitimate reason to reject Dr. House's opinion.  (Doc. 14, 13 (quoting Revised Medical Criteria

15   for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65 (Aug.

16   21, 2000).)  Plaintiff further argues that the ALJ improperly based his decision on his "biased"

17   opinion that anyone with limitations as extreme as those opined to by Dr. House "would likely be

18   institutionalized[.]"  (Doc. 14, 13-14; *see* AR 21.)  Finally, Plaintiff argues that Dr. House's

19   opined mental RFC is consistent with the overall medical record.  (Doc. 14, 14.)

20       The Commissioner contends the ALJ properly discounted Dr. House's opinion as

21   inconsistent internally and with the overall medical record, and the ALJ's statement that a person

22   with such extreme limitations as those assessed by Dr. House might require institutionalization

23   does not constitute impermissible "personal bias."  (Doc. 18, 10-11.)

24       Plaintiff was seen by Dr. House on at least seven occasions from December 2011 through

25   June 2012.  (AR 501-04; 506-10; 573-74.)  On December 15, 2011, Dr. House noted diagnoses of

26   "episodic mood disorders" and "Autistic disorder" (AR 510), noted increased anxiety, irritability,

27   and erratic sleep in March of 2012 (AR 507), increased anxiety in May of 2012 (AR 574), and

28   continued Plaintiff's prescriptions for Paxil and Xanax – anti-anxiety medications – throughout

1    their treating relationship.  (AR 501-04; 506-10; 573-74.)  Dr. House completed a mental RFC

2    assessment questionnaire on April 24, 2012, opining to the extreme limitations imposed by

3    Plaintiff's mental impairments.  (AR 501-04.)  Dr. House assigned Plaintiff a "current" GAF score

4    of 55 in his mental RFC assessment and opined that Plaintiff was at least "seriously limited" or

5    "unable to meet competitive standards in every single assessed category of work ability.  (AR 501-

6    04.)  Dr. House further opined that Plaintiff was so limited as to have "no useful ability" to deal

7    with normal work stress, sustain an ordinary routine without special supervision, complete a

8    normal workday and workweek without interruptions from his psychologically based problems, or

9    work in coordination with or proximity to others.  (AR 501-04.)  Finally, Dr. House opined that

10   Plaintiff would miss more than four days of work each month due to his mental impairments.

11   (AR 504.)

12       The ALJ gave "less weight" to treating physician Dr. House's opinion of Plaintiff's

13   limitations "than it may otherwise merit" because it was "completely inconsistent with [ ] a GAF

14   score of 55[.]"  (AR 21.)  The ALJ cited *no* specific medical evidence contradicting Dr. House's

15   findings, but instead generally discounted the full extent of limitations opined by Dr. House as

16   unsupported by the GAF score, "which represents someone with only moderate symptoms or

17   difficulty functioning" and not someone "having such extreme limitations as assessed by Dr.

18   House."  (AR 21.)

19       ALJs "may only reject a treating or examining physician's uncontradicted medical opinion

20   based on 'clear and convincing' reasons.'"  *Carmickle v. Commissioner*, 533 F.3d 1155, 1164 (9th

21   Cir. 2008) (citing *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995)).  When rejecting the

22   opinion of a treating physician, the ALJ can meet this "'burden by setting out a detailed and

23   thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof,

24   and making findings.'"  *Tommasetti*, 533 F.3d 1035, 1041 (9th Cir. 2008) (quoting *Magallanes*,

25   881 F.2d at 751).  Treating source medical opinions are entitled to deference and, "[i]n many

26   cases, will be entitled to the greatest weight and should be adopted, even if [they do] not meet the

27   test for controlling weight."  *Orn*, 495 F.3d at 632.

28       Here, the ALJ specifically relied on the GAF score of 55 that Dr. House assigned Plaintiff

on April 24, 2012, as being internally inconsistent with the rest of Dr. House's mental RFC

assessment.   GAF scores are "rough estimates of an individual's psychological, social, and

occupational functioning used to reflect the individual's need for treatment."  *Vargas v. Lambert*,

159 F.3d 1161, 1164 n.2 (9th Cir. 1998).   In arriving at a GAF Score, clinicians consider

psychological, social, and occupational functioning on a hypothetical continuum of mental health

illness.   Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 34.   The GAF

definition of range 51-60 indicates "moderate symptoms" or "moderate difficulty" in social,

occupational or school functioning.  DSM-IV at 32.

"As a global reference intended to aid in treatment, 'a GAF score does not itself

necessarily reveal a particular type of limitation and is not an assessment of a claimant's ability to

work.'"  *Garcia v. Astrue*, 170 Soc. Sec. Rep. Serv. 686, 2011 WL 4479843 at *4 (E.D. Cal. 2011)

(quoting *Stokes v. Astrue*, 2009 WL 2216785 at *7 (M.D. Fla. 2009)).   In practice, "'GAF scores

are of very limited usefulness due to their failure to translate into concrete functional limitations.'"

*Id.* (quoting *Stokes*, 2009 WL 2216785 at *7).   *See* 65 Fed. Reg. 50764-65 ("The GAF scale . . .

does not have a direct correlation to the severity requirements in our mental disorders listings.").

GAF scores are unreliable indicators of a claimant's ability to perform sustained work, as

they are "merely a snapshot in time" that may or may not be supported by the overall medical

record.   *Mann v. Astrue*, 2009 WL 2246350 at *2 (C.D. Cal. 2009); *see also* SSR 85-15

("Individuals with mental disorders" may adopt "a highly restricted . . . lifestyle within which they

appear to function well," but "may cease to function effectively when facing such demands as

getting to work regularly, having their performance supervised, and remaining in the workplace

for a full day.").   Further, while a GAF score can tell the ALJ something in a very general way

about a plaintiff's ability to perform basic work activities, the specific score does not address

which particular aspect(s) of functioning is being addressed.   Therefore, it can be difficult to

ascertain whether GAF scores are meant to score a plaintiff's occupational functioning – ability to

work – rather than perhaps addressing a plaintiff's overall symptoms or social functioning.  *See,*

*e.g., Ackermann-Papp v. Comm'r of Soc. Sec.*, 127 Soc. Sec. Rep. Serv. 1163, 2008 WL 314682 at

*3 (W.D. Mich. 2008); *Bronson v. Astrue*, 530 F. Supp. 2d 1172, 1180-81 (D. Kan. 2008) (noting

1     GAF scores "are in a continuum" and "include[ ] all problems affecting a patient").  "GAF scores

2     do not dispositively assess a plaintiff's ability to work." *Garcia*, 2011 WL 4479843 at *4.

3         The ALJ gave little weight to Dr. House's opinion because it "is completely inconsistent

4     with someone with a GAF score of 55, which represents someone with only moderate symptoms

5     or difficulty functioning[.]"  (AR 21.)  Though the ALJ was permitted to consider the GAF score

6     in his reasoning, *see Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001), he was not permitted

7     to "rely on [the GAF] score alone.  No single piece of information taken in isolation can establish

8     whether [a claimant has] a 'marked' or 'extreme' limitation in a domain."   20 CFR

9     § 416.926a(e)(4)(i).  Moreover, the ALJ failed to explain why the GAF score – which does not

10    dispositively assess Plaintiff's ability to work – superseded Dr. House's more precise opinions as

11    to Plaintiff's ability to function in a work-related setting.

12        While an ALJ may reject a physician's opinion as unsupported or inconsistent with his

13    own examination findings, *see Tomassetti*, 533 F.3d at 1041, a single GAF score of 55 does not

14    constitute substantial evidence in light of the record as whole.  The Commissioner acknowledges

15    "that there will be inconsistencies between a claimant's GAF scores and an assessment of a

16    claimant's ability to do work; thus, it was error in this case to use this data, provided by [Dr.

17    House], as a general assessment to disprove [Dr. House]'s more detailed, expert functional

18    assessment."  *Provencio v. Astrue*, 179 Soc. Sec. Rep. Serv. 558, 2012 WL 2344072 at *8 (D.

19    Ariz. 2012); *see* 65 Fed. Reg. 50764 (cautioning that the GAF scale does not have a direct

20    correlation to the severity requirements in the Agency's mental disorder listings).

21        When the record is viewed as a whole, it is apparent that while Plaintiff has adopted "a

22    highly restricted . . . lifestyle within which [he] appear[s] to function well," *see* SSR 85-15, his

23    ability to function under any sort of pressure is severely impacted by his crippling anxiety

24    (*see, e.g.,* AR 42-43 (unable to attend GED classes due to anxiety), 46-47 (unable to complete

25    summer job due to anxiety), 48-50 (forced to skip "many, many days" at another summer job), 51

26    (unable to make phone calls due to anxiety), 267 (educational notes on Plaintiff's "anxious

27    reactions" to stress including "shakiness, stammered speech, and memory loss")).  The moderate

28    GAF score Dr. House assigned to Plaintiff on a single day in 2012 appears largely to reflect

1    Plaintiff's ability to retain his composure during an evaluation with a longstanding treating

2    physician; when read in the context of the overall medical record, the score is not indicative of

3    Plaintiff's overall ability "to function effectively when facing such demands as getting to work

4    regularly, having [his] performance supervised, and remaining in the workplace for a full day."

5    *See* SSR 85-15.

6          The ALJ also erroneously rejected Dr. House's opinion, in part, because "[a] person with

7    such extreme limitations [as those opined to by Dr. House] would likely be institutionalized and

8    unable to function at all and certainly would not be able to continue with their education right up

9    until shortly prior to graduation." (AR 21.) The ALJ did not point to any medical evidence to

10   support his opinion. (*See* AR 21.) Though the ALJ may rely, in part, on his own observations,

11   they *cannot* be used as a substitute for medical diagnosis. *See Marcia v. Sullivan*, 900 F.2d 172,

12   177 n.6 (9th Cir. 1990). An ALJ may not substitute his own layperson opinion for that of trained

13   medical physicians, and "'must not succumb to the temptation to play doctor and make h[is] own

14   independent medical findings.'" *Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006)

15   (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see Garcia*, 2011 WL 4479843 at *9

16   (same). *See also Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985) (ALJ may not "set his

17   own expertise against that of a physician who presents competent evidence").

18         Here, the ALJ predicated his rejection of Dr. House's medical opinion, in part, on his own

19   layperson opinion about how "such extreme limitations" as those opined to by Dr. House "would

20   likely" have rendered Plaintiff "institutionalized" and cannot be an accurate reflection of

21   Plaintiff's true limitations. (AR 21.) The ALJ's layperson speculation on the reasonableness of

22   Dr. House's opinion is not a legally sufficient reason to discount that opinion. *Marcia*, 900 F.2d at

23   177 n.6. Accordingly, the ALJ erred in rejecting Dr. House's opinion.

24   **B.      Remand for Award of Benefits is Appropriate**

25         The Court has discretion to remand a case for further evidence or to award benefits.

26   42 U.S.C. § 405(g) ("[t]he court shall have power to enter, upon the pleadings and transcript of the

27   record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social

28   Security, with or without remanding the cause for a rehearing."). "Where the Commissioner fails

1    to provide adequate reasons for rejecting the opinion of a treating or examining physician, [the

2    Court] credit[s] that opinion 'as a matter of law.'" *Lester*, 81 F.3d. at 834 (quoting *Hammock v.*

3    *Bowen*, 879 F.2d 498, 502 (9th Cir. 1989)).  Evidence should be credited and an immediate award

4    directed where (1) the ALJ failed to provide legally sufficient reasons for rejecting such evidence,

5    (2) there are no outstanding issues that must be resolved before a determination of disability can

6    be made, and (3) it is clear from the record that the ALJ would be required to find the claimant

7    disabled were such evidence credited.  *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004)

8    (quoting *Smolen*, 80 F.3d at 1292).  If this test is satisfied, then remand for a finding of disability

9    is warranted, regardless of whether the ALJ might have articulated a different justification for

10   rejecting opinion evidence.  *See Harman v. Apfel*, 211 F.3d 1172, 1179 (9th Cir. 2000); *see also*

11   *Varney*, 859 F.2d at 1399 (9th Cir. 1988) ("Generally, we direct the award of benefits in cases

12   where no useful purpose would be served by further administrative proceedings, or where the

13   record has been thoroughly developed." (citation omitted)).

14       "[A]pplying the [credit-as-true] rule is not mandatory when, even if the evidence at issue

15   is credited, there are 'outstanding issues that must be resolved before a proper disability

16   determination can be made.'"  *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010) (quoting

17   *Vasquez v. Astrue*, 572 F.3d 586, 593 (9th Cir. 2009).  The Commissioner argues that even if Dr.

18   House's opinion were fully credited, remand for an award of benefits is not warranted because "it

19   is not clear that Dr. House's opinion stands for the proposition that Plaintiff is disabled under the

20   regulations, and crediting the doctor's opinion would not necessarily result in a finding of

21   disability."  (Doc. 18, 14.)  The Commissioner further contends that a remand for an award of

22   benefits is not warranted because there are outstanding issues to be resolved, noting that "[t]he

23   ALJ pointed to Plaintiff's established range of daily activities and successful school records, as

24   well as examinations yielding good results and the absence of objective evidence establishing

25   disabling limitations, in support of his finding that Plaintiff's symptoms were not as disabling as

26   alleged[.]" (Doc. 18, 14.)

27       The ALJ pointed to Plaintiff's history as a "good student" at Clovis West High School, and

28   his activities of daily living, including "independently caring for his own personal hygiene[,]

performing light household chores, such as cleaning his room[,] watching television[,] playing video games[,] and socializing with friends" as evidence that Plaintiff is not disabled.  (AR 22.) However, the fact that Plaintiff is liked by teachers, has friends, and is capable of occasional focus or concentration in an unpressured setting does *not* discredit his claim that he is crippled by anxiety, nor does it indicate that Plaintiff is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions or skills that are transferable to a work setting.  *See, e.g., Orn*, 495 F.3d at 639; *Burch*, 400 F.2d at 681; *Fair*, 885 F.2d at 603.  A review of the record establishes that Plaintiff's anxiety is more than a slight abnormality with a minimal effect on Plaintiff's ability to work – Plaintiff's anxiety is a persistent and serious condition which Plaintiff's treating physicians believed was both severe and disabling.

Plaintiff's record indicates a history of serious problems and significant limitations stemming from his anxiety.  The record reveals multiple mental health 5150 and 5585 holds and suicide attempts.  (*See* AR 332; 339; 455-69.)  Plaintiff's teachers repeatedly noted Plaintiff's "anxious reactions" and "apprehension," and described Plaintiff as becoming "visibly anxious" when under pressure to perform.  (AR 267 (noting Plaintiff exhibits "shakiness, stammered speech, and memory loss.").)  Though he was fairly liked by teachers and described as agreeable and "responsible," almost every teacher expressed concern that Plaintiff's frequent absences would result in his failing out of school.  (AR 240-59 (in September 2009, Plaintiff had "32 periods of excused absences, 4 periods of doctor's absences, and 6 excused tardies during the first six weeks of school.").)

Plaintiff was unable to complete high school because "the stress and anxiety got to him" and unable to even attend the GED program because of his crippling anxiety.  (*See* AR 42-43 (describing how he was unable to exit his father's truck to attend the first day of GED classes or enter the library for tutoring sessions because he was overwhelmed by anxiety).)  Plaintiff left a one-month summer job early due to his anxiety (AR 46-47), and though he made it through another one-month summer job, he "skipped many, many days" due to his anxiety (AR 48-50.)  Plaintiff went to "State Rehab" for help with employment, but could not use a phone to make calls due to the severity of his anxiety.  (AR 51.)

1    Including Dr. House, three separate treating physicians opined that Plaintiff would be

2    forced to miss more than four days a month of work due to his mental impairments.  (AR 431;

3    479; 504.)  Another treating physician echoed Dr. House and Plaintiff's teachers, opining that

4    Plaintiff' anxiety "makes him non-functional" and he "rapidly deteriorates under any type of work

5    demand, performance expectation, or pressure to complete tasks."  (AR 478; 488.)  Even

6    consulting examiner Dr. Glidden, who was conservative in his assessment of Plaintiff's mental

7    limitations, opined that "[b]ecause of the severe social phobia experienced, [Plaintiff] is at a

8    significantly reduced capacity to function in a work setting[.]"  (AR 523.)  Even if Plaintiff has

9    friends, is well-liked by teachers, and is of average or above-average intelligence in some areas,

10   when the record is reviewed as a whole, it is clear that Plaintiff's ability to consistently perform in

11   a full-time work-related setting is severely restricted by his crippling anxiety.

12   Here, the *Smolen* test for award of benefits on remand is met.  80 F.3d at 1292.  In

13   rejecting Dr. House's opinion on the basis of a single GAF score and relying on his own layperson

14   opinion of the severity of the limitations opined to by Dr. House, the ALJ failed to provide legally

15   sufficient reasons for rejecting Dr. House's medical opinion.  Contrary to the Commissioner's

16   assertion, there are no outstanding issues to be resolved before determining that Plaintiff is

17   disabled.  *See Harman*, 211 F.3d at 1178-79 (the fact that the ALJ *might* have articulated another

18   justification for rejecting the physician's opinion does not create an outstanding issue precluding

19   remand for determination and payment of benefits).

20   Finally, were Dr. House's opinion fully credited, the record reveals that the ALJ would be

21   required to find him disabled.  When Plaintiff's attorney amended the hypothetical question to the

22   VE at the hearing to reflect Plaintiff's limitations as opined to by Dr. House, the VE indicated that

23   such an individual would *not* be able to perform any of the jobs the expert had previously

24   specified in response to the ALJ's hypothetical.  (AR 68-69 (the VE testified that a hypothetical

25   person who would miss four days of work per month due to his psychological symptoms, could

26   not work with any coworkers or the public and could only occasionally interact with his

27   supervisor, and must be supervised constantly throughout his shift would not able to work); *see*

28   *also* AR 501-04.)  Thus, if Dr. House's opinion as to Plaintiff's limitations were credited-as-true,

the VE's testimony would establish that Plaintiff is unable to work. *See Varney v. Sec. of Health and Human Services*, 859 F.2d 1396, 1401 (9th Cir. 1988); *Gallant v. Heckler*, 753 F.2d 1450, 1457 (9th Cir. 1984).

"Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication." *Benecke*, 379 F.3d at 595. "Remanding a disability claim for further proceedings can delay much needed income for claimants who are unable to work and are entitled to benefits, often subjecting them to 'tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand.'" *Id*. Because the improperly discredited evidence of Dr. House's opinion establishes disability when properly credited, Defendant should not be given endless opportunities to correct her mistakes while Plaintiff waits for an error-free decision. *See Hammock v. Bowen*, 879 F.2d 498, 503 (9th Cir. 1989). The record is fully developed and, considering the evidence that the ALJ improperly discredited, a finding of disability is required.

In sum, substantial evidence does not support the Commissioner's decision. The Court reverses the Commissioner's decision and remands this case for a determination of benefits.

## VI.   CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for an award of benefits. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Max Sheldon Margulis and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   __**March 6, 2015**__                    _____**/s/ Sheila K. Oberto**
                                                          UNITED STATES MAGISTRATE JUDGE